VAN R. HUMPHREY, *et al.*

*v.*

PALMER E. HAVENS, *et al.*

The general rule that when there is any competent evidence reasonably tending to sustain the finding of a referee upon a question of fact, the finding will not be disturbed in this Court, unless the finding is most manifestly and palpably against the weight of evidence, is not affected by the fact that all the evidence introduced before the referee was written or printed.

An authority in an agent to do a certain act, cannot be implied from the fact that another act of an essentially different character has been performed by the assumed agent, to which the principal has assented.

Where the agency is to be inferred from the *conduct* of the principal, that *conduct* furnishes the only evidence of the *extent* of the agency as well as of its existence. Authority to bind a principal to the payment of the note and mortgage of a third person, is not to be inferred from an authority to make a promissory note binding the principal.

When the belief of the authority of an agent arises only from previous action

on his part as an agent, the persons so treating with him must on their own responsibility ascertain the nature and extent of his previous employment.

A ratification must be with full knowledge of all the material facts of the transaction ratified.

Where the knowledge that a person assuming to act as agent has exceeded his authority does not reach the principal until it is out of his power to restore what he received through the transaction which he (the principal) seeks to repudiate, the principal is not bound to make such restoration as a condition of the repudiation; nor is he bound to make such restoration as a mere formality, when the restoration could be of no practical value.

This action was commenced by Van R. Humphrey and Laura M. P. his wife, against Palmer E. Havens, Betsey E. his wife, John McConkey and Harriet E. B. his wife, Andrew M. Torbet, James K. Humphrey, J. W. Selby and Benjamin Allen, in the District Court for Ramsey Co. to foreclose a mortgage upon certain real estate, and to hold the defendant Havens, with other defendants, personally liable for any balance of the mortgage debt which might remain after the sale of the mortgaged premises. There is no opposition to the foreclosure of the mortgage, but the defendant Havens denies his personal liability, which makes the only issue in the case. The cause was tried at the May term of said Court 1863, before the Court without a jury. The finding of the Court was in favor of the defendant Havens. The plaintiffs afterwards moved the Court for a new trial on the ground of newly discovered evidence, which evidence was contained in two letters written by defendant Havens; the Court denied the motion, and an appeal was taken by the plaintiffs from the order denying the same, as well as from the judgment which had been entered upon the findings of the Court. The order denying the motion for a new trial was reversed by this Court and a new trial granted. (See *Humphrey et al. vs. Havens et al.*, 9 *Minn. R.*, 318.) The cause was then referred to Geo. L. Otis, Esq., and on the trial before him, by stipulation of coun-

sel, the evidence introduced on the former trial was read from the settled case and that constituted all the evidence, except the two letters of Havens, upon the discovery of which the new trial was granted, and a deposition of defendant Havens. The facts as found by the referee are as follows, viz :

That on or about the 15th day of October, 1856, the defendant Palmer E. Havens, then of Essex, in the State of New York, appointed and constituted the defendant Harriet E. B. McConkey, then Miss Harriet E. Bishop, a *feme sole*, of Saint Paul, Minn., his agent at the latter place for the investment of money, with certain powers and instructions, which said agency was so constituted by a written letter or instrument in writing, bearing date of that day, signed by the said Palmer E. Havens, and containing the powers and instructions aforesaid. (This letter is designated Exhibit A, and is set out at length in the opinion of the Court.) That the said Harriet E. Bishop accepted of said agency, and in pursuance thereof, received from time to time and invested for him the said Palmer E. Havens large sums of money, and that the said Harriet E. Bishop, subsequently, after her acts hereinafter set forth, and before the commencement of this action, intermarried with the defendant John McConkey.

That on or about the 17th day of June, A. D. 1857, the said Harriet E. Bishop assuming to act for the said Palmer E. Havens, and as part of an arrangement hereinafter stated, procured from the defendants Andrew M. Torbet and one Caroline Torbet, his wife, a conveyance to the said Palmer E. Havens, of a certain tract of land known and designated as Lot Thirteen (13) in Kinney out lots, in section thirty-three, (33) Township twenty-nine, (29) in Range twenty-three, (23) in the County of Ramsey, and State of Minnesota; said conveyance was made by deed duly executed and re-

corded, and containing the usual covenants of warranty and seizin, * * * That afterwards, and on or about the 14th day of October, A. D. 1857, the said Harriet E. Bishop, assuming to act for the said Palmer E. Havens, and in pursuance of said arrangement procured from the defendant Andrew M. Torbet and the said Caroline his wife, a conveyance to the said Palmer E. Havens of certain other of said Kinney out lots to wit, lots five, six and seven, in said section thirty-three, which said conveyance was so made by deed duly executed and recorded, * * *

That on the said 14th day of October, 1857, to further carry out said arrangement, the said Harriet E. Bishop procured from the said Andrew M. Torbet and wife a conveyance to herself of lots nine, eight and fourteen, of said Kinney out-lots, in said section thirty-three, by deed duly executed and recorded. * * * That the said Andrew M. Torbet acquired his title to and became seized of said lots by deed dated the 21st day of February, 1857, executed by the defendant James K. Humphrey unto the said Torbet, duly executed and recorded, in and by which said deed said James K. Humphrey conveyed to the said Andrew M. Torbet, the aforesaid Kinney out lots, 5, 6, 7, 8, 9, 13 and 14, and also lot ten of said Kinney out lots, and in order to secure a portion of the purchase money for said conveyance, and as part of the same transaction, the said Andrew M. Torbet executed back to the said James K. Humphrey a mortgage upon the aforesaid eight Kinney out lots, said mortgage bearing date the said 21st day of February, 1857, and conditioned for the payment to the said James K. Humphrey, of the sum of two thousand seven hundred and thirty-two dollars in four years and six months, from the twentieth day of December, 1856, with interest at ten per cent. per annum, according to the condition of a certain promissory note of said last named date,

which said mortgage was duly executed and recorded.  *  *

That the note described in said mortgage was dated Saint Paul, Minn., Dec. 20th, 1856, whereby four years and six months after the date thereof, for value received, the said Andrew M. Torbet did promise to pay to the said James K. Humphrey, or order, two thousand seven hundred and thirty two dollars, with interest at ten per cent. per annum, and was duly endorsed by the said James K. Humphrey, and by the defendant J. W. Selby, before the maturity thereof, and delivered so endorsed to the plaintiff, Laura M. P. Humphrey, who is now the lawful owner and holder thereof, and no part thereof has been paid, except the sum of $136.60, paid for interest thereon up to June 20th, 1857.  *  *  *

That on or about the 16th day of June, 1857, at the request of said Harriet E. Bishop, the said Andrew M. Torbet duly conveyed said lot ten of said Kinney out lots to one Benjamin Allen.

That in consideration of the aforesaid several conveyances of the said Kinney out lots, the said Harriet E. Bishop, representing to the said Andrew M. Torbet that she had full authority to bind the said Palmer E. Havens, by such an agreement, undertook for herself, and on behalf of the said Palmer E. Havens, to pay off the said note and mortgage, and to relieve the said Andrew M. Torbet, and save him harmless therefrom, and to that end, and as a part of the said transaction, she, the said Harriet E. Bishop, executed for herself, and undertook to execute for the defendant Palmer E. Havens, that certain instrument set forth in the complaint, as exhibit K,  *  *  *  (exhibit K is set out at length in the opinion of the court and there designated exhibit K,) which written instrument and exhibit was the sole and only consideration for the execution of the aforesaid several deeds executed by said Andrew M. Torbet, of the said Kinney out lots,

and was the only consideration for said several conveyances, except as stated hereafter.

That on or about the 14th day of April, 1857, by an instrument in writing of that date, the said Palmer E. Havens and Betsey E., his wife, duly constituted the said Harriet E. Bishop, their attorney in fact, to bargain, sell and convey all of their· real estate in the State of Minnesota and Wisconsin.   *   *

That afterwards, on or about the 2d day of October, 1858, the said Harriet E. Bishop, who had before that time intermarried with the defendant, John McConkey, together with her husband, John McConkey, by an indenture of that date duly bargained, sold and conveyed to the said Palmer E. Havens, said Kinney outlots, numbers 9, 8 and 14, together with certain other real estate, which said deed contained the usual covenants of warranty.   *   *   *   *

That on the same day and as part of the same transaction, the said Palmer E. Havens of the one part executed to and with the said Harriet E. and John McConkey of the other part, a certain instrument in writing, which said instrument in writing is correctly set forth in Exhibit M.   *   *   *   * (Exhibit M is so designated in the opinion of the court and is set out at length therein.)

That the said Andrew M. Torbet took the aforesaid conveyance of the said Kinney out lots from the said James K. Humphrey, at the request of the said Harriet E. Bishop, acting for herself and assuming to act also for the said Palmer E. Havens, jointly with herself, and with the understanding and under a verbal agreement with the said Harriet E. Bishop, that he would hold the title to the same in trust for her the said Harriet E. Bishop and the said Palmer E. Havens, and would thereafter convey the same as she the said Harriet E. Bishop should request and direct, acting in that behalf as the confidential friend of the said Harriet E.

Bishop, and not expecting any benefit to himself from said conveyance, and to accommodate the said Harriet E. Bishop, he did advance from his own money a portion of the consideration for said lots, which money so advanced was subsequently returned to him by the said Harriet E. Bishop, the said Harriet E. Bishop desiring not to be known to the said James K. Humphrey as a party to said transaction; and at the like request of the said Harriet E. Bishop, and solely for and on account of the said Harriet E. Bishop, and as her confidential friend as aforesaid and expecting and with a verbal understanding that he should be saved harmless therefrom, he the said Torbet executed the said promissory note and the aforesaid mortgage to the said James K. Humphrey, and it was in accordance with such original understanding that the said Torbet subsequently conveyed the said Kinney out lots as above set forth, and thereupon received said agreement of indemnity in good faith and supposing that both the said Harriet E. Bishop and the said Palmer E. Havens were personally bound thereby to save him harmless from the said note and mortgage.

That the said mortgage was duly transferred by the defendant James K. Humphrey to the plaintiff, Laura M. P. Humphrey, together with said promissory note, prior to the commencement of this action.

That prior to the purchase of the aforesaid Kinney out lots from the said James K. Humphrey as aforesaid, the said Harriet E. Bishop had purchased a tract of land of the said Andrew M. Torbet, in Washington county, Minnesota, for and on behalf of the said Palmer E. Havens, in part upon credit, and to secure a part of the purchase money, had executed to the said Torbet a promissory note for $500, signing thereto the name of the said Palmer E. Havens, of which note the said Palmer E. Havens was advised by the letter of

the said Harriet E. Bishop, bearing date December 27th, 1856, and the said Havens was advised in and by said letter that the holder of said note wanted his money thereon, that before said letter could have reached said Havens and be answered by him, the said Harriet E. Bishop received from the said Havens a further remittance af $3,000, to be invested under her said instructions, contained in Exhibit " A." out of which said remittance she did pay off the said note.

That the said Torbet was before the maturity of said note and is now insolvent and unable to pay off said note and mortgage, and the said mortgaged premises, the said eight Kinney out lots, are a slender and scanty security and insufficient in value to pay said note and mortgage. That the said Palmer E. Havens and Betsey his wife, on the 9th day of November, 1858, executed in due form an instrument in writing revoking or annulling the power of attorney from them to said Harriet E. Bishop, as fully as such power of attorney could then and after the execution of said Exhibit " M " be by them revoked and annulled.

That the said Palmer E. Havens has never reconveyed nor procured a reconveyance, nor offered to reconvey or procure a reconveyance, to the said Torbet of the said Kinney out lots or any part thereof.

That the said Palmer E. Havens first knew of the existence of the written instrument, Exhibit " K," on or about the 9th of November, 1859, and so learned of the same by letter from said Torbet received on or about that date, and thereupon immediately notified said Torbet that he had never given to his said agent authority to make such an instrument, or to bind him in any manner personally to the payment of money for lands purchased on credit, nor can I discover from the testimony and evidence that said contract was ever thereafter ratified by said Havens.   *   *   *

As conclusions of law the referee found as follows, viz:

1. That the said Harriet E. Bishop had no authority to execute said agreement of indemnity (Exhibit "K,") for, or on behalf of the said Palmer E. Havens.

2. That no act of the said Havens done by him while ignorant of the said agreement of indemnity, can be held to be a ratification of said agreement, nor do the facts in this action show any such ratification on the part of the said Havens.

3. That said Exhibit "M" does not create a trust for the payment of this debt, and the same cannot be enforced by the plaintiff for such purpose.

4. That said Exhibit "K" is binding upon the defendant Harriet E. McConkey, though not upon the defendant Palmer E. Havens.

5. That the plaintiffs are entitled to the usual judgment of foreclosure of the said mortgage so executed by said Torbet to said James K. Humphrey, and by him assigned to plaintiffs.

6. That the plaintiffs are entitled to judgment for any deficiency remaining after the proper application of the proceeds of the sale of said mortgaged premises, against said defendants Harriet E. McConkey and John McConkey her husband, James K. Humphrey, J. W. Selby and Andrew M. Torbet.

Judgment was entered in the court below pursuant to such findings, and the plaintiffs appealed to this court.

SMITH & GILMAN, for Appellants.

GREENLEAF CLARK, for Respondents.

*By the Court.*—BERRY, J. This action was tried below before a referee. The testimony was all written or printed;

and upon this state of facts and the authority of *Martin vs. Brown*, 4 *Minn.*, 282, it is insisted that this Court should examine the testimony for the purpose of determining its weight. The views expressed in favor of the propriety of this course in *Martin vs. Brown*, were not, so far as we can discover, necessary to the decision of that case. Indeed, we think, it will be found that in that instance the Court did not attempt to examine the testimony for the purpose of determining upon its sufficiency and preponderance, but granted a new trial solely upon the ground that the facts found and admitted in the pleadings, failed to sustain a material conclusion of law. What is said in *Martin vs. Brown* upon the point under consideration, cannot then be regarded as of binding authority. *See Carroll vs. Carroll's lessees*, 16 *How.* (*U. S.*) 287.

It has been repeatedly held in this Court, and elsewhere, that as a general rule, the finding of a jury, a court or a referee, upon a question of fact, will not be disturbed where there is any evidence reasonably tending to sustain it. *Davis vs. Smith*, 7 *Minn.* 421; *Hoagland vs. Wright*, 7 *Duer*, 395; *Dunning vs. Roberts*, 35 *Barb.* 468; *Ball vs. Loomis*, 29 *N. Y.* 414; *Sons of Temperance vs. Bass*, 11 *Minn.*, 356. Whether such finding rests upon oral or written testimony should in our judgment make no difference. In the case of a trial by jury, while it is true as remarked in *Martin vs. Brown* that, "one great reason why courts are loth to disturb the verdict of a jury upon a question of fact, is because the jury having the advantage of witnessing the appearance and conduct of the witnesses on the stand, are better able to judge of the weight to be given to their testimony" than an appellate court, it is also and equally true, as remarked by Mr. Starkie, "that the experience, which would best enable those whose duty it is to decide on matters of fact arising out of the concerns and dealings of society to discharge that duty, must be

that which results, and which can only result, from an intimate intercourse with society, and an actual knowledge of the habits and dealings of mankind, and that the reasoning faculties best adapted to apply such knowledge and experience to the best advantage in the investigation of a doubtful state of facts, are the natural powers of strong and vigorous minds unencumbered and unfettered by the technical and artificial rules by which permanent tribunals would be apt to regulate their decisions." 1 *Starkie Ev.*, 8, *7th Am. Ed. & note by Lord Brougham.*

So far as the merits of the trial by jury depend upon the considerations presented by Mr. Starkie, it could make no difference whether the testimony was oral or written. The trial by a referee is in a large majority of cases a substitute for trial by jury. The referee is quite generally nominated and agreed upon by the parties to the action, on a confidence in his practical judgment, or if selected by the court, is presumed to be selected with reference to his fitness for the trial of the particular issues involved.

We think the findings of referees should stand upon the same footing as the findings of juries, and that whether the testimony is oral or written, such findings should be held conclusive where there is conflicting evidence, unless most manifestly and palpably against the weight of evidence, or some rule of evidence or principle of law has been violated.

In case of such conflict it must be a very extraordinary state of things which would warrant us in setting aside the finding of a referee, or of a jury as against the weight of evidence. It is obvious that the same rule should be applied where the evidence is doubtful or susceptible of two constructions.

There appear to be two conclusions of fact found by the referee to which the appellant takes exception. The first is

that the $500 note executed by Miss Bishop for and in behalf of and in the name of Havens, and in favor of Torbet, was paid by Miss Bishop out of funds received from Havens before the letter written by Miss Bishop to Havens advising him of the existence of the note and that the holder of the note wanted his money could have been received and answered by Havens.   The second is that Havens was first informed of the existence of the agreement of indemnity known as Exhibit K., on the 9th November, 1859.   In both cases there was evidence to sustain the finding of the referee, and although there was other evidence or circumstances tending to establish a state of facts contrary to the finding, under the rule which we have before laid down, the conclusions on these points are not to be disturbed.   There is no manifest and palpable disregard of the weight of evidence such as would authorize us to interfere.   There is another statement found among the conclusions of fact, to which no particular exception appears to be taken as a conclusion of fact, as it is found again, and we think, in its proper place among the conclusions of law, and as a conclusion of law is objected to by the appellant.   We refer to the conclusion that there was no ratification of Exhibit K by Havens.   It remains to consider whether the conclusions of law are supported by the facts found by the referee; and following the order adopted by both counsel upon the argument, we come to inquire, first, whether Harriet E. Bishop had authority to execute the instrument known as Exhibit K, for and in behalf of Palmer E. Havens the respondent.   Exhibit "K" reads as follows:

EXHIBIT K.

*Territory of Minnesota,*  } *ss.*
    *County of Ramsey.*

   This indenture, made this 14th day of October, in the year of our Lord one thousand eight hundred and fifty-seven, be-

tween Andrew M. Torbet, of Ramsey County, and Territory of Minnesota, party of the first part, and Palmer E. Havens of Essex, County of Essex, State of New York, and Harriet E. Bishop of the County of Ramsey and Territory of Minnesota, of the second part, witnesseth, that the said parties of the second part in consideration of deeds given by the party of the first part, to the parties of the second part, agree to take his place, and pay a certain promissory note and take up a certain mortgage given upon lots five (5), six (6), seven (7), eight (8), nine (9), ten (10), thirteen (13) and fourteen (14), in Kinney's out-lots, in section thirty-three (33), township twenty-nine (29), north, of range twenty-three (23), according to the recorded plat thereof, with all the interest thereon, and release the party of the first part from all costs and charges, provided the said note and mortgage is not promptly met.

This agreement shall be binding on the parties, their heirs and assigns, for, and until the above claim is cancelled. In witness whereof, we have hereunto set our hands and seals this day and year above written.

HARRIET E. BISHOP, [SEAL.]
PALMER E. HAVENS,

By his attorney in fact, Harriet E. Bishop, [SEAL.]

It is found by the referee that the original appointment of Harriet E. Bishop as his agent by Havens was the following letter:

EXHIBIT "A."

Essex, October 15th, 1856.

*Miss Harriet E. Bishop:*—I have some spare funds on hand which I desire to place where they will earn me more than in this region. My brother, John F. Havens, at Moriah, thought you could handle some of my means with safety and profit, and that you would be willing, for a reasonable compensation, to act as agent in making some investments for

me, or putting my money out at a good rate of interest. I hear of profitable investment in lands and high rates of interest at your place, and am anxious through the assistance of some friend and agent in whom I can have confidence, to reap a few sheaves in the harvest myself. On the assurance of my brother, as to your prudence, skill and judgment, and willingness to aid me, I have ventured to enclose you herewith $1000 for investment or loaning, without previous correspondence in relation to the matter. I do not think best to instruct you particularly in relation to your action. My object is to make money. I desire you to use this money in my name, and as my agent at your own discretion, either in the purchase of real estate or loaning, as you or your advisers may think may be most profitable for me in the end.

Do as you would for yourself in the accomplishment of the desired object. My own rule is to loan to no man except on the best security, such as unincumbered real estate, double in value the amount loaned, or two names of undoubted responsibility. I rather my money would be idle than be invested where there is a particle of doubt. This rigid course has saved me thousands of dollars. I have little doubt from what I hear, that you can purchase me some lands which will increase rapidly in value. In any case of doubt, and in making all necessary papers, please consult and employ the best counsel and professional assistance at hand, at my expense, and if necessary to incur expense in looking up desirable locations of land to purchase, please do so at my expense; but I have so much confidence in your judgment and ability, that I apprehend all I need to say is, do as you would for yourself, and charge me for your services. When deeds are taken get them recorded and send them to me. Notes and securities for loans retain in your own hands, as my agent, sending me from time to time a full statement of what you

have done, also your charges and expenses, so that all can be entered on my books and registers. You will do well also to keep a memorandum of all you do on a book for that purpose, so that all will be plain in case you should be suddenly called home. I am quite particular in all my business, and endeavor when I retire to rest at night, to leave my affairs all plain for my executor if I should not wake in the morning. I can send you some five or ten thousand dollars to operate with at your place, if you can give the business your attention, and are willing to take hold and help me get rich. I have some means now in the west earning me twenty-five per cent, on good real estate security, and you may do as well if not much better for me there. I am told these certificates I send you are worth one or two per cent. above par at your place. They paid me one per cent above par for them at Rock Island.

What you can get above par please credit me towards expenses. I enclose receipt papers for you to sign and return to me.                    Truly yours,

                                   P. E. HAVENS.

P. S.—In relation to your charges, please put them as you think will be a reasonable compensation, and if you manage to get me great gains, you may expect to be further remembered by me.

We think the gist of the letter is the following paragraph : " I desire you to use this money in my name and as my agent . at your own discretion, either in the purchase of real estate or loaning as you or your advisers may think may be most profitable for me in the end." The agency was created solely for " *the purchase of real estate or loaning* ;" and a fair construction of the letter confines the authority conferred to these objects alone. *See Rossiter vs. Smith*, 8 *Wend.*, 498 ; 1 *Taunton* 347 ; 1 *Am. L. C.*, 544–566. The discretion

Humphrey et al. v. Havens et al.

entrusted to the agent is a discretion as to " purchases of real estate and loaning." There is nothing to authorize the agent to borrow money or use the credit of the principal. The whole tenor of the letter contemplates cash transactions only. It is also found by the referee that prior to the purchase with reference to which Exhibit K was executed, the said Harriet E. Bishop had purchased a tract of land of Torbet, for Havens; and to secure a part of the purchase money had executed to said Torbet a promissory note for $500, signing Havens' name thereto, of which note said Havens was advised by letter from Harriet E. Bishop, dated Dec. 27th, 1856, and that "the said Havens was advised in and by said letter that the holder of said note wanted his money thereon, and that before said letter could have reached said Havens, and be answered by him, the said Harriet E. Bishop received from the said Havens a remittance of $3000, to be invested under her said instructions contained in Exhibit A, out of which remittance she paid off said note." Under this state of facts it is claimed by the counsel for the appellants, that even if Harriet E. Bishop exceeded her authority in executing Exhibit K, Torbet, to whom the $500 note ran, had a right to infer that Miss Bishop was authorized to make such an instrument as Exhibit K, which also ran to Torbet. This position is sought to be enforced by the fact that it does not appear that Havens (though he made his agent many subsequent remittances) ever " objected, complained or suggested that she had exceeded her authority in making the note." It would perhaps be a sufficient answer to this to say, that it does not appear whether there was any objection or complaint on the part of Havens or not; there is nothing proved or found on the subject. But it is found by the referee that the note was paid by Miss Bishop out of Havens' funds before advice of the existence of the note had reached Havens.

A payment made under such circumstances would have very little if any tendency to show that the parties by their own acts put the construction upon Exhibit A which is contended for by the appellants' counsel, or to show that Torbet had a right to infer that Miss Bishop possessed authority to execute Exhibit K subsequently to the payment of the note. Whether a *single* transaction, standing alone, like the execution and payment of the $500 note, not a part of a *usual* course of dealing, would be sufficient to sustain an implication of agency and authority to perform other *like* acts so as to bind a supposed principal, is a matter upon which authorities disagree. *Hazard vs. Treadwell*, 1 *Str.*, 506; *Gilman vs. Robinson* 1 *Car.*, *& P.* 642; *Dunlap's Paley on Agency*, 4 *Am. ed.*, 161-3 *and notes;* 1 *Parsons Conts.*, *5th ed.*, 49; 1 *Am. L. C.* 568. But at any rate, an authority in an agent to do a certain act, cannot be implied from the fact that another act of an entirely different character has been performed by the assumed agent, to which the principal has assented. The reason upon which the implication of authority rests is, that the principal has *acquiesced* in the assumption of authority, that he has allowed a certain person to appear to be his agent, and should therefore be held responsible for whatever he may do within the scope of the apparent power.

But as is laid down in *Cox vs. Hoffman* 4 *Dev. and Bat.* 180, " when the agency is to be inferred from the conduct of the principal, that conduct furnishes the only evidence of its *extent* as well as of its *existence*." *See* 1 *Am. L. C.*, 573. Assuming then that the transaction in regard to the $500 note would have been sufficient to bind the principal to the payment of another note given under similar circumstances, the question is, would a transaction of that nature raise an implication of authority in Harriet E. Bishop to bind Havens by an instrument of the nature of Exhibit K. We think it would not.

Exhibit K differs radically and substantially from a promissory note; it assumes to bind Havens to the payment, not only of the note of a third person, but of a mortgage executed by such third person. It would hardly be contended that the power to make a note for a principal would imply authority in the agent to secure such note by a mortgage of the principal's real estate; yet this is in effect what exhibit K undertakes to do. We think the *extent* of authority to be implied even from the usual and repeated execution of promissory notes with the assent of the principal, would not cover a transaction of the nature of Exhibit K. See 1 *Am. L. C.*, 4*th Am. ed.*, 573.

If Torbet saw fit to rely upon the circumstances under which the note was given and paid, as evidence of Miss Bishop's authority to bind Havens, by exhibit K, it was his own fault, for "when the belief of the authority of an agent arises only from previous action on his part as an agent, the persons so treating with him must on their own responsibility ascertain the nature and extent of his previous employment." 1 *Parson's Cont.*, 5*th Ed.*, 48 *and notes.*

But if Harriet E. Bishop possessed neither express nor implied authority to bind her principal by exhibit K., it is contended that Havens ratified and adopted the transaction by his subsequent acts so as to bind himself. And first it is claimed that the execution of Exhibit M by Havens, was a ratification of Exhibit K. In the view which we take, it is unnecessary here to recite Exhibit M at length, for it appears to have been executed Oct. 2, 1858, and the referee finds that Havens "first knew of the existence of the written instrument Exhibit K, on or about the 9th day of Nov., 1859." All the authorities agree that a ratification must be with full knowledge of all the material facts. *Owings vs. Hull*, 9 *Peters*, 629; 1 *Am. L. C.*, 595; *Mixon vs. Palmer*, 4 *Selden*, 401;

*Woodbury vs. Larned,* 5 *Minn.*, 344. Havens cannot be held to have ratified Exhibit K by Exhibit M which thus appears to have been executed without any knowledge that exhibit K was in existence.

Finally it is urged that Havens has ratified Exhibit K by retaining the property, the conveyance of which was the consideration of that instrument. The facts of the case as found by the referee show that Torbet took the conveyance of eight certain lots known as Kinney out lots in his own name, at the request of Miss Bishop, acting for herself, and assuming to act for Havens jointly with herself, and with the verbal understanding and agreement with Miss Bishop, that he would hold the title thereto in trust for her and Havens, and would convey the lots as she should direct, not for purposes of benefit to himself, but as a matter of accommodation, and that he executed a note and mortgage to Humphrey, the vendor of the lots, with a verbal understanding that he should be saved harmless therefrom; that he conveyed the lots according to the above understanding, and received the agreement of indemnity (Exhibit K) in good faith, supposing that by it Miss Bishop and Havens were personally bound to save him harmless from said note and mortgage. That he (Torbet) conveyed four of said out lots to Havens, three of said out lots to Miss Bishop, and the remaining out lot to one Benjamin Allen, all which conveyances contained covenants of warranty; that as a consideration for said conveyances, Miss Bishop, representing that she had full authority to bind Havens by such an agreement, undertook, for herself and Havens to pay off said note and mortgage, and to that end, and as a part of the said transaction, executed for herself, and undertook to execute for Havens, the instrument known as Exhibit K, which instrument was the sole consideration for said conveyances, except certain money which Torbet had paid Humphrey, the

vendor, on account of the purchase for the accommodation of Miss Bishop, and which she subsequently repaid him. That afterwards and on or about October 2d, 1858, Miss Bishop, then Mrs. McConkey, and her husband, conveyed to Havens, the three lots conveyed by Torbet to her, and that on the same day Havens of the one part, executed to and with the said Harriet E. McConkey and her husband of the other part, a certain instrument known as Exhibit M, which reads as follows:

### EXHIBIT "M."

Articles of agreement made and entered into this 2d day of October, A. D. 1858, between Palmer E. Havens, of Essex, N. Y., of the one part, and John McConkey and Harriet E. Bishop, his wife, of the other part. Witnesseth, that whereas said Palmer E. Havens did heretofore remit to and place in the hands of said Harriet E. Bishop, previous to her marriage with said John McConkey, the following sums of money, to-wit: 1856, October, 15th, $1,000; 1856, November 4th, $1,-000; 1856, October 29th, $1,000; 1856, *December* 16th, $1,-000; 1857, *January* 7th, $3,000; 1857, February 3d, $1,000; 1857, January 3d, $1,000; 1857, February 3d, $1,000; 1857, May 27th, $464.50; 1857, December 8th, $500; 1858, January 1st, $514.12; 1858, January 4th, $150; 1858, August 1st, $140; $11,768.62.

All of which said sums of money were remitted at the above several dates, in bank drafts, to said Harriet E. Bishop, at St. Paul, her place of residence, to be by her invested in the purchase of real estate, and in loans upon good security, as agent for said Palmer E. Havens, which said several sums of money in all amount to $11,768.62, with one-half per cent premium to be added, and the larger part of said sum has been invested and loaned out by said Harriet, and some portion of the same still remains in her hands unaccounted for.

The purchases of real estate made by said Harriet, as agent for said Havens, are as follows, to-wit :   250 acres of land at and near Cottage Grove, some nine miles from St. Paul, $2,-500 ; five shares stock in Saint Peter's Company, $500 ; an undivided one-sixth of forty acres of land in Pond's addition to Hudson, $591.66 ; five acres of woodland near Saint Paul, $600 ; an undivided half of eighty acres of land near Lake Como, $400 ; four Kinney out lots, Nos. 13, 5, 6 and 7, near St. Paul, $1000 ; an undivided half of lot in St. Paul, known as Conlee lot, $750 ; an undivided half of Allen's addition to Dunnville, $600.   The above sums are the purchase prices paid for said lands.   And for a portion and as a dividend thereof, said Harriet has drawn an undivided half of two lots upon said St. Peter stock.

There was $464.50 of said Haven's money loaned to one Andrew M. Torbet, and for which loan and interest thereon, said Torbet, by recent arrangement with said Havens, has conveyed to said Havens certain undivided real estate interests at Hastings, Dakota County, Minnesota, and in Washington County, Minnesota, and St. Croix County, Wisconsin, and an undivided half of eighty acres of land in Ramsey County, near Lake Como, in settlement of said loan.   Two thousand dollars of said money was loaned to E. W. Cressey, on note and mortgage upon farm near Hastings, which mortgage appears to be subject to other and previous incumbrances, and with a view to facilitate the collection of said mortgage, said Havens has recently obtained from said E. W. Cressey a quit-claim deed of said farm.   The said H. E. Bishop has a joint interest with said Havens in said Conlee lot, being herself the other joint owner.   She also owns in fee lots 9, 8 and 14, of the Kinney out-lots.   And she owns also, two-sixths of said 40 acres of land in Hudson as joint owner with said Havens.

And there are *incumbrances* upon said Conlee and Kinney lots, amounting to between four and five thousand dollars to be paid *before the title* of said Havens and Bishop will be *unincumbered and perfect to said lots.* The said Harriet E. Bishop has intermarried with said John McConkey since transaction of above business, and the said John McConkey and said Harriet his wife, are desirous to purchase all the real estate, interests and titles above mentioned, and make provision for the repayment to said Havens of the said moneys remaining in the hands of said Harriet unaccounted for. Now, therefore, it is covenanted and agreed between the said parties first above mentioned, as follows: The said John McConkey and Harriet, his wife, on their part, agree to pay to said Havens, said sum of $11,768.62, within five years from the date hereof, with annual interest on the same, at the rate of fifteen per cent per annum, to be cast from the date of the remittances as above recited, up to the present time, and until paid, and said sums shall include premiums at above rate. And also what expenses said Harriet has actually been subjected to in the business, an accurate account of which shall be rendered. As security for the performance of the above contract, said McConkey and wife have conveyed to said Havens real estate of said Harriet, as follows: The house and lot in St. Paul now occupied by said McConkey and wife, known as lot No. 5, in block No. 7, in Whitney's and Smith's addition to St. Paul; also her real estate interest owned jointly or severally with said Havens as above recited. Also an undivided $\frac{1}{4}$ of 80 acres of land in the vicinity of Point Douglass. It is further agreed, that if said McConkey and wife pay to said Havens, said sum above mentioned, within one year from the date hereof, interest shall only be cast annually since the date of the remittances up to the time paid, at the rate of seven per cent per annum only. And if

any portion of same is paid to said Havens within two years from the date hereof, such part of the principal as would amount to the sum so paid, at seven per cent per annum annual interest, shall be cancelled, except that payment of annual interest as above first provided, shall not be embraced in this arrangement.    Said Havens on his part in consideration of the above agreement on the part of said John McConkey and wife, and in consideration of said conveyances of real estate so made to him as security, for himself, his heirs and assigns, covenants and agrees to and with said John McConkey and wife, their heirs and assigns, that if said John Mc-Conkey and wife perform on their parts the covenants and agreements above mentioned, he, said Havens, shall and will as soon as practicable thereafter, convey to said John Mc-Conkey, and said Harriet, their heirs or assigns, all the real estate interests so purchased by said Harriet for said Havens, and also all the real estate interests so as above conveyed by said John McConkey and wife to said Havens, by quit claim deeds and conveyances, good and sufficient in law.

And it is further mutually agreed, that said McConkey and wife may at any time sell portions of said real estate and make conveyances of same through the power of attorney, now held by said Harriet from said Havens, on the express condition that such sales shall be judiciously made, without sacrifice of property, *and the avails of such sales shall be either paid directly to said Havens on said general indebtedness, or shall be paid to the persons holding said incumbrances on said Kinney lots, or said Conlee lot, as payment of the same, in which case duplicate receipts shall be obtained, and one of them forwarded to said Havens.*    And in all more important transactions, said Havens shall be consulted as to such sales and his advice in the matter shall be followed.    And said Mc-Conkey and wife shall keep said Havens fully and promptly

advised, touching all transactions under this contract as the same transpire. And if said Havens shall choose to make the desired conveyances himself, he shall have the right to do so, instead of using said power.

*The horse recently taken by said Havens from E. W. Cressey may be retained by said John McConkey and wife, but when sold, avails shall be paid to said Havens on said debt, or applied in payment of said incumbrances.* As matters of more full explanation it is agreed that the sum above alluded to as remaining in the hands of said Harriet E. Bishop unaccounted for, is three thousand ninety-three dollars and twenty-nine cents. It is understood also between the parties that the expenses of all conveyances, shall be borne by said McConkey and wife. It is also understood that all said Havens' right and interest in said Cressey farm shall be transferred to said McConkey and wife in fulfilment of said contract as above. The mention above of the sum of $3,093,-29 as present sum in hands of Harriet E. Bishop, embraces interest moneys which had been received and cast, and does not alter or change the said first mentioned sum of $11.-768.62, but the true sum to be paid to said Havens under this contract is said $11.768.62 and one-half per cent premium and expenses and interest as above provided. Dated at St. Paul as above first written.

The word " we " erased twice ; the words " and an undivided half of eighty acres of land in Ramsey county near Lake Como," " per annum," " said Havens," " said Havens," " per annum," " per annum," " sales," " one of them," " more," interlined before execution.

PALMER E. HAVENS,                (L. S.)
JOHN McCONKEY,                   (L. S.)
HARRIET E. BISHOP McCONKEY.      (L. S.)

In Presence of
DAN. D. MERRILL,
M. S. MARKS.

The expenses of said Havens within mentioned, are hereby liquidated and agreed upon at the sum of thirty dollars.

PALMER E. HAVENS,     (L. S.)

J. McCONKEY,     (L. S.)

HARRIET E. B. McCONKEY.     (L. S.)

Dated October 20th, 1858.

*State of Minnesota,* } *ss.*
*County of Ramsey.*

Be it known, that on this 2d day of October, A. D. 1858, before me personally appeared Palmer E. Havens, John McConkey and Harriet E. B. McConkey, his wife, the signers and sealers of the within contract, and acknowledged the signing and sealing to be their own free act and deed, for the uses and purposes therein expressed; and the said Harriet E. B. McConkey, wife of said John McConkey, on an examination separate and apart from her said husband, acknowledged that she executed the same freely and without fear or compulsion from any.     DANIEL D. MERRILL,

(L. S.)     Notary Public, Minn.

Filed Nov. 27th, 1858, at 11 A. M.

Recorded in Book O, of Mortgages, page 221, &c.

The referee finds that Havens has never reconveyed, nor procured a reconveyance, nor offered to reconvey, nor offered to procure a reconveyance to the said Torbet of the said lots or any part thereof.

The referee finds further, that Havens first knew of the existence of Exhibit K, on or about the 9th day of November, 1859, and so learned of the same by letter from said Torbet, received on or about that date, and thereupon immediately notified said Torbet, that he had never given to his said agent authority to make such an instrument, or to bind him in any many personally to the payment of money for lands purchased on credit. It is also found that on the 9th November, 1858,

Havens executed an instrument revoking the power of attorney to Miss Bishop, as fully as it could be done, after the execution of Exhibit M.

It thus appears that of the eight out lots, one had been conveyed by Torbet to Allen, and this was beyond Havens' control. Three had been conveyed by Torbet to Miss Bishop, and by her conveyed to Havens in mortgage "as security for the performance of the above contract," in the language of Exhibit M. To these four lots then, Havens had no title which he could convey to Torbet. The other four out lots had been conveyed by Torbet to Havens directly. But these four lots were incumbered by the agreement which Havens had made in reference to them in Exhibit M; an agreement not only with Miss Bishop, then Mrs. McConkey, but also with McConkey, the husband himself. Even if Havens might have avoided the agreement so far as Mrs. McConkey was concerned, it is not easy to see how he could have done so in reference to her husband, who was no party to any of the previous transactions upon which Exhibit M may be said to have been founded; and all this the referee finds to have been done before Havens was made aware of the execution of Exhibit K. Under this state of facts, Havens was in no position to restore to Torbet the property, the conveyance of which was the consideration of Exhibit K. Nor was it Havens' fault that he could not place Torbet in *statu quo*. The lots conveyed to Allen and Miss Bishop never had been under his control, and the other four conveyed to himself, he had placed beyond his control before he had been informed of the facts upon which it is now sought to charge him. Now while it is true that he does not reconvey, or offer to reconvey to Torbet, it is also true that he cannot. Will the law compel him as a condition of repudiating Exhibit K, to do that which he cannot do, and which it is not his fault that he cannot do?

We think not. "There is no doubt that if one person knows that another has acted as his agent without authority, or has exceeded his authority as agent, and with such knowledge accepts money, property or security, or avails himself of advantages derived from the act, he will be regarded as having ratified it. This would not be the case when the knowledge that the person had exceeded his authority is not received by the employer so early as to enable him before a material change of circumstances to repudiate the whole transaction without essential injury." *Bryant vs. Moore* 26 *Maine*, 84. More than this. It is alleged in the *complaint*, and found by the referee, that the eight lots are " a slender security and insufficient in value to pay said note and mortgage thereon," upon which this action is founded. The whole case proceeds upon the theory that this is the fact.

The object of the suit is to foreclose the mortgage on the lots, and if the lots fail to satisfy the mortgage debt, to charge certain parties with the deficiency, and among them to hold Havens under Exhibit K. Now if the lots (which it is to be presumed will sell for their value at the foreclosure sale) are worth the amount of the mortgage, there will be no occasion to call on Havens or any other person for a deficiency. If, on the other hand the lots are not worth the amount of the mortgage debt, then the value of the equity of redemption is nothing. Torbet loses nothing by Havens' inability to reconvey the four lots which Torbet conveyed directly to him. A reconveyance would be an idle formality of no practical value to Torbet, and *lex neminem cogit ad vana seu impossibilia.*

It is, however, claimed that Havens holds the covenants of warranty contained in Torbet's deed to him. Certainly he does not if he repudiates the whole transaction. Should he attempt to hold Torbet on these covenants, it would be a complete defence that Havens had repudiated the consideration

for the covenants, and the entire transaction out of which they arose.

Havens denies that Miss Bishop had any authority to purchase property and take conveyances in his behalf in the way in which this was done. This rejection of what Miss Bishop has assumed to do for him, renders the covenants void and valueless, and he could not enforce them. See *Nichols vs. Michael*, 23 *N. Y.*, 273. Under such circumstances there can be no occasion for Havens to execute and deliver to Torbet any release of the covenants. It will be remembered in addition to the foregoing considerations, that Humphrey never contracted for any security or liability on the part of Havens, and without any such liability or security, Humphrey has all that his contract called for. Of what moment is it to Humphrey that Havens reconveys or refuses to reconvey the lots to Torbet? Even if Torbet could under the facts of this case insist upon the reconveyance, he does not appear to have done so, and his answer to the complaint would seem to waive any claim on that score, by its demand of a relief which would be incompatible with a reconveyance.

We believe that the foregoing disposes of all the positions upon which the appellants urge their claim to a judgment for deficiency against Havens, and it follows that the judgment below must be affirmed.